IN THE UNITED STATE DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

KELSEY D. THOMAS, as mother and next
friend of J.P.G., a minor,

Civil Action No. 5:17-cv-386 (MTT)

Plaintiff,

vs.

**FIRST AMENDED COMPLAINT**
**(Jury Trial Demanded)**

HOUSTON HEALTHCARE SYSTEM,
INC., D/B/A/ HOUSTON MEDICAL
CENTER, COLLEEN WELLS, D.O., and
HOUSTON OB/GYN, L.L.C.,

Defendants.

COMES NOW the Plaintiff, Kelsey Thomas, as mother and next friend of J.P.G., a minor,

by and through her attorneys, to show to the Court the following case:

**PARTIES AND JURISDICTION**

1.      The Plaintiff is a resident of Woodward, Oklahoma.  Kelsey Thomas (Kelsey Dion

at the time of the events described herein) is the mother and natural guardian of J.P.G., a minor.

2.      Defendant Houston Healthcare System, Inc. is a corporation authorized to do

business under the laws of the State of Georgia and does business in Houston County as Houston

Medical Center and employs nurses and other health care professionals.  Defendant Houston

Healthcare System, Inc. has identified Cary W. Martin, 1601 Watson Blvd., Warner Robins, GA

31093 as its registered agent.

3.      Houston Medical Center is owned and/or operated by Defendant Houston

Healthcare System, Inc. and has an address of 1601 Watson Blvd., Warner Robins, Georgia 31093.

At all relevant times, the health care providers rendering care to Kelsey Thomas and her unborn

child at Houston Medical Center, including but not limited to the nurses and staff were the agents

(actual and/or apparent), servants, and/or employees of the Defendant Houston Healthcare System, Inc., and acting within the scope of their agency and/or employment.  Furthermore, at all times relevant, any individuals who participated in or should have participated in the promulgation, implementation and enforcement of policies, procedures, and protocols that governed the provision of obstetrical care at Houston Medical Center, by physicians, nurse midwives, nurses or others, to Kelsey Thomas and J.P.G., did so in the capacity of an actual and/or apparent agent of Defendant Houston Healthcare System, Inc.  Defendant Houston Healthcare System, Inc. is subject to the jurisdiction and venue of this Court.

4.      Defendant Houston OB/GYN L.L.C., is a limited liability company organized and existing under the laws of Georgia and doing business in Houston County.  Houston OB/GYN L.L.C. has a single member, Dr. Carlo Lee who is a citizen and resident of the State of Georgia. Defendant Houston OB/GYN L.L.C., holds itself out as a provider of medical care and employs healthcare providers to provide obstetrical care to patients such as Kelsey Thomas.  At all times relevant, Colleen Wells, D.O. was an employee and/or agent (actual or apparent) of Defendant Houston OB/GYN L.L.C.  Houston OB/GYN L.L.C. has identified Carlo Lee as its registered agent with an address of 104 Racking Ln., Perry, GA 31069.

5.      Defendant Colleen Wells, D.O., is a resident of Pennsylvania.  At the time of the events complained of she was a resident of Georgia and acted individually and as the actual and/or apparent/ostensible agent, servant, and/or employee of Houston OB/GYN L.L.C.  Defendant Colleen Wells, D.O. is a physician, and, during all times relevant, was licensed in the state of Georgia and practicing the specialty of obstetrics and gynecology.

6.      During the times that each of the Defendants provided care to Kelsey Thomas and J.P.G., a healthcare provider-patient relationship existed.

7.     There is, consistent with 28 U.S.C. § 1332, diversity of citizenship between the parties in that the Plaintiff is a citizen and residents of Oklahoma, Defendant Colleen Wells is a resident of Pennsylvania,  Defendant Houston Healthcare System, Inc. is a corporation with a principle place of business in Georgia, and Defendant Houston OB/GYN L.L.C. is a limited liability company with a principle places of business in the state of Georgia and a single member, Dr. Carlo Lee, who is a citizen and resident of Georgia.  The amount in controversy exceeds $75,000.00.

8.     Venue is appropriate in the District because the acts of alleged medical malpractice occurred in Houston County, Georgia.

## STATEMENT OF FACTS

9.     On or about June 15, 2011, Kelsey Thomas established prenatal care with Defendant Colleen Wells, D.O. and her practice group, Defendant Houston OB/GYN L.L.C.  This was her first pregnancy.  She was 18 years old and married.  At the time of her first prenatal visit, her fetus had an estimated gestational age of 12 weeks and 5 days.

10.     Ms. Thomas was seen by Dr. Wells and her staff throughout her pregnancy.  During the prenatal period, routine tests and ultrasounds indicated that her fetus was developing normally.

11.     Ms. Thomas' due date was estimated to be December 23, 2011.

12.     On December 15, 2011, Ms. Thomas was admitted to Houston Medical Center for induction of labor.  At that time her fetus had a gestational age of 38 and 6/7 weeks.

13.     Upon admission to Houston Medical Center, Ms. Thomas came under the care of Heather Sorrow, R.N. and other nurses and staff employed by or acting as agents of Houston Medical Center.

14.     Shortly after admission, Ms. Thomas was placed on an electronic fetal monitor.

15.     An electronic fetal monitor is a device that records the fetal heart rate and the mother's contractions.  The electronic fetal monitor prints both the fetal heart rate and the mother's contractions simultaneously on continuous strips of paper.   This information is also stored electronically.

16.     Patterns in the fetal heart rate during labor provide information regarding fetal oxygenation and tolerance of labor.  Fetuses that are not well oxygenated or otherwise not tolerating the intrauterine environment will exhibit non-reassuring fetal heart rate patterns.

17.     The fetal heart rate on admission exhibited moderate variability with accelerations of the fetal heart rate and no decelerations.  These are reassuring findings for fetal status in utero.

18.     At 0700, Nurse Heather Sorrow notified Dr. Colleen Wells of Ms. Thomas' admission.     Dr. Wells ordered that Pitocin be started according to the hospital's standing orders.

19.     Pitocin is a medicine administered intravenously to stimulate the uterus to contract. The hospital's standing orders for Pitocin called for it to be started at 1 mu/min and increased by 2 mu/min every 30 minutes until contractions are 2-4 minutes apart and last 40-60 seconds.  If not managed appropriately, Pitocin can cause contractions to occur too frequently.  When this happens, there is an increased risk of fetal distress and associated nonreassuring fetal heart rate patterns.

20.     Nurse Heather Sorrow began the Pitocin administration at 0824.

21.     At around 0853, Dr. Wells was at bedside to examine Ms. Thomas and perform an artificial rupture of membranes.  At that time, Ms. Thomas' cervix was 1cm dilated, 50% effaced, and her baby was at the -3 station.

22.     According to the records, by 0930 the Pitocin was infusing at 5 mu/min and the contractions were coming every 2-4 minutes and lasting 70-100 seconds.

23.     A cervical exam at 1010 found that Ms. Thomas' cervix was 3-4 cm dilated, 80% effaced, and her baby was at the -1 station.

24.     By noon, the Pitocin was infusing at 15 mu/min.  Ms. Thomas was having contractions every 2-3 minutes that lasted 70-90 seconds.

25.     By 1646, Ms. Thomas' cervix had progressed to 7-8 cm dilated, 90% effaced, and her baby was at the -2 station.  The Pitocin infusion continued.

26.     At 1750, Dr. Wells was at Ms. Thomas' bedside.  According to Dr. Wells' exam, Ms. Thomas was then 8 cm dilated, 100% effaced, and her baby was at -2 station.  By this time, a pattern of fetal heart rate decelerations had developed.

27.     At 1825, Dr. Wells coached Ms. Thomas in pushing with contractions.  A cervical exam revealed that she was near complete cervical dilatation.  The fetal heart rate was now decelerating with every contraction.

28.     At 1834, Ms. Thomas was on a birthing ball.

29.     Nurse Heather Sorrow's shift ended and Nurse Rosealee Garcia assumed Ms. Thomas' care just before 1900.

30.     At 1903 Ms. Thomas was back in the bed and Dr. Wells was present and helping her push through a contraction.  She was not yet completely dilated.  A cervix check recorded at 1910 found that she was 9cm dilated, 100% effaced, and her baby was at the -1 station.  According to Nurse Garcia, the fetal heart rate exhibited moderate variability, a normal baseline, and early decelerations.  The Pitocin infusion continued.

31.     Ms. Thomas reached complete cervical dilation at approximately 1933.  The Pitocin infusion continued and Ms. Thomas began pushing with contractions.  Fetal heart rate

decelerations occurred with each contraction and the recovery took longer and longer and variability diminished.  These are concerning signs of inadequate oxygenation of the fetus.

32.     At 2005, Dr. Wells was in the room.   Ms. Thomas continued pushing with contractions.  At 2016, Dr. Wells removed the fetal scalp electrode and prepared for a vacuum extraction attempt.

33.     According to the records, at 2017, Dr. Wells attempted a vacuum extraction but was unsuccessful.  Nurse Garcia wrote that the fetal heart rate could be heard audibly in the 80s and 90s.  Over the next seven minutes, Dr. Wells made three more attempts at vacuum extraction without success or descent of the fetal head.  The Pitocin infusion continued.

34.     At 2026, belatedly, Dr. Wells called a cesarean section for nonreassuring fetal heart rate tracings.

35.     Ms. Thomas arrived in the operating room at approximately 2035.  The surgery began at 2040 and the baby was delivered at 2044.

36.     At delivery, J.P.G. was severely depressed and in need of urgent resuscitation.  He was limp, blue, not breathing, and unresponsive.  His Apgar scores at 1, 5, and 10 minutes were 1, 3, and 7, respectively.

37.     J.P.G. received immediate positive pressure ventilation and chest compressions.  He was intubated and placed on a mechanical ventilator.

38.     Though cord blood was collected, Dr. Wells did not request a cord blood gas.  A cord blood gas would have shown the degree of acidosis present in the baby at the time of delivery.

39.     The first arterial blood gas was taken at 2154, an hour and ten minutes after delivery.  Even after resuscitation and receiving oxygen on a ventilator, J.P.G. remained severely acidotic.  His arterial blood pH was 7.13, his base excess was -21 and his lactate was 16.1.

40.     A subsequent arterial blood gas taken at midnight found that J.P.G.'s acidosis persisted, his pH was 7.24 and base excess was -14.

41.     At around 0800 the next morning J.P.G. was taken off the ventilator.  Shortly afterward he was noted to be irritable and jittery.

42.     The next day, Sunday, December 18th, a head ultrasound was done that was concerning for possible bleeding.

43.     He was transferred to the NICU at The Medical Center, Navicent Health for continued care.  His discharge diagnoses included hypoxic ischemic encephalopathy.

44.     J.P.G. remained hospitalized until January 3, 2012.  During the hospitalization the physicians caring for him ruled out infection and ongoing intracranial bleed as the cause of his neonatal encephalopathy.  Hypoxic ischemic encephalopathy, due to inadequate oxygenation in utero, was thus the most probable explanation for his condition.

45.     Today, J.P.G. suffers from a permanent brain injury, developmental delays, and other related neurological deficits.  As a result of these injuries, he will require care throughout his life.

46.     As a further result of his injuries, J.P.G. has suffered and will suffer, severe physical pain, emotional distress, lost or diminished earning capacity, dependence on others for activities of daily living, and other harms and consequences.

47.     J.P.G.'s condition has required, and will require medical, surgical, hospital, nursing, and custodial care, pharmaceuticals, equipment, transportation, housing, special education, and other forms of special needs, all of which would have been avoided had the Defendants complied with the standard of care.

48.     Had Defendants adhered to the applicable standard of care, J.P.G. would have been delivered before damaging asphyxia occurred and his injuries and damages would have been avoided entirely.

## LEGAL ENTITIES AND DUTIES

49.     Plaintiff specifically re-alleges Paragraphs 1-48 as if set forth fully herein.

50.     Defendants, each of them, directly and through their actual and/or apparent/ostensible agents, servants, and/or employees, owed a duty to Plaintiff to exercise that degree of reasonable care and skill exercised by like health care professionals of good standing under similar circumstances.

51.     Defendant Houston Healthcare System, Inc. d/b/a Houston Medical Center is liable for the acts and omissions of its nurses and other health care providers during their care and treatment of Kelsey Thomas and her baby, under the doctrine of *respondeat superior* and agency.

52.     Defendant Houston Healthcare System, Inc. d/b/a Houston Medical Center is liable for failing to have or failing to enforce appropriate policies and procedures that should have ensured that Ms. Thomas received appropriate obstetrical care.

53.     Defendant Houston OB/GYN L.L.C. is liable for the acts and omissions of Colleen Wells, D.O., during her care and treatment of Kelsey Thomas and her baby, under the doctrine of *respondeat superior* and apparent agency.

54.     Dr. Colleen Wells is individually liable for her acts and omissions during her care and treatment of Kelsey Thomas and J.P.G.

55.     Contrary to the aforesaid duties owed by the Defendants, jointly and severally, the Defendants were negligent in their diagnosis, care, monitoring, response, and treatment of Kelsey Thomas and her fetus, and such negligence was the proximate cause of the injuries and damages sustained and sued for in this action.

56.     Defendant Houston Healthcare System, Inc. d/b/a Houston Medical Center, by and through its employees and agents, breached its duties to Kelsey Thomas and J.P.G. by deviating from the accepted standard of medical care in the following particulars:

   a.     failing to properly manage Kelsey Thomas' obstetrical care on December 15, 2011;

   b.     failing to notify the attending obstetrician, Dr. Colleen Wells of fetal heart rate decelerations;

   c.     failing to advocate for an expedited delivery in light of the nonreassuring fetal heart rate patterns;

   d.     by not administering intrauterine resuscitation in light of the nonreassuring fetal heart rate patterns;

   e.     by misuising Pitocin during Ms. Thomas' labor,

   f.     failing to have appropriate policies and procedures in place to manage patients such as Ms. Thomas and/or failing to properly train and/or supervise its nursing staff so that patients such as Ms. Thomas would receive appropriate obstetrical care, and

   g.     failing in such other ways as may be revealed during discovery and shown at trial.

57.     Defendant Colleen Wells, D.O., individually, and Houston OB/GYN L.L.C., by and through the acts of Colleen Wells, D.O., breached their respective duties owed to Kelsey Thomas and J.P.G. by deviating from the accepted standard of medical care in the following ways:

   a.     by failing to appropriately act on nonreassuring fetal heart rate patterns during labor;

9

b.    by failing to reduce or discontinue the Pitocin in light of the nonreasurring fetal heart rate patterns;

c.    by failing to expedite delivery by cesarean section in response to the nonreassuring fetal heart rate patterns;

d.    by inapprorpriately using a vaccuum extractor;

e.    in such other ways as may be revealed during discovery and shown at trial.

## DAMAGES

58.    As a direct and proximate result of the aforesaid negligence of the Defendants as alleged herein, jointly and severally, the infant J.P.G. was caused to suffer a traumatic delivery, and to sustain severe, painful, permanent and disabling injuries, including, but not limited to:

a)  permanent and irreversible neurological injury;

b)  permanent cognitive and motor dysfunction;

c)  speech and language difficulties;

d)  past, present, and future pain and mental anguish;

e)  past, present, and future diminished enjoyment and quality of life;

f)  future loss of earnings and diminished earning capacity.

59.    As a further direct and proximate result of the aforesaid negligence of the Defendants, J.P.G. has required and will continue to require medical, nursing, and related care, therapies, and other care including specialized devices, equipment, transportation and housing for which significant sums of money are being, have been, and will continue to be expended in the future.

60.    J.P.G., a minor, by his mother and next friend Kelsey Thomas sues Defendants for injuries to his person, including pain and suffering, past, present, and future, general and special damages, including all damages alleged herein and those otherwise allowed by law.

10

61.     Had the Defendants complied with the applicable standard of care in this case, the injuries and damages complained of would have been avoided.

62.     Pursuant to O.C.G.A. §9-11-9.1, Plaintiff  has attached to her First Amended Complaint as Exhibits "1" and "2" the Affidavits of Rachel McCarter, MD, and Jane Payne, RN, setting out at least one negligent act on the part of each defendant, and their employees, and the factual basis supporting it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a trial by jury on all issues and further demands judgment against the defendants for a sum in excess of Seventy Five Thousand Dollars ($75,000.00) for the injuries and damages alleged herein and request that they be compensated with a fair, adequate, and just award, plus costs of this action.

*(Signature next page)*

Respectfully submitted this 4th day of December, 2017

> */s/Jay D. Lukowski*
> Jay D. Lukowski
> Georgia Bar No:  460799
> Kaplan & Lukowski, LLP
> 333 Sandy Springs Circle.
> Suite 200
> Atlanta, GA 30328
> 404-845-0012
> 404-845-0028 FAX
> jdl@kaplanlegal.com
>
> And
>
> Gerald D. Jowers, Jr.
> (*pro hac vice*)
> Giles H. Manley
> (*pro hac vice*)
> Janet, Jenner & Suggs, LLC
> 500 Taylor St., Suite 301
> Columbia, SC 29201
> 803-726-0050
> 803-727-1059 FAX
>
> *Attorneys for Plaintiff*